HARLEY THORNTON

*v.*

DELIA M. THORNTON.

[Filed July 26th, 1904.]

The evidence in a divorce suit *held* to show both parties guilty of adultery, and that the petitioner connived at defendant's adultery.

On petition for divorce and cross-bill.

*Mr. James C. Connolly,* for the petitioner.

*Mr. Abe J. David,* for the defendant.

BERGEN, V. C.

The petitioner charges his wife, the defendant, with the crime of adultery, committed with a man by the name of Willis, in Jersey City, on Sunday, March 13th, 1904. The defendant has answered, denying the allegation, and by way of cross-bill charges her husband with adultery, and prays that she may be divorced from him for that cause. Without at this time entering into any analysis of the evidence offered by the petitioner in support of his charge, I have no hesitation in saying that the evidence fully convinces me that the defendant is guilty of the offence charged, and that if the defence set up by the defendant has failed the petitioner is entitled to the decree he prays for.

Having determined that the defendant is guilty of adultery, it follows that she is not entitled to the aid of this court, even if the charge she makes against her husband be established, and it is also well settled that if the husband be convicted of a like offence his petition will be dismissed, notwithstanding the guilt of his wife.

The defendant insists that, assuming her guilt, the petitioner

is not entitled to the decree he asks for—*first,* because her husband had committed adultery with some person unknown to the petitioner; *second,* because he connived at and aided in the accomplishment of the downfall of his wife. This latter reason was not set up in the pleadings, but the evidence on the point was received, the question thoroughly argued by counsel, and no surprise being alleged it was ordered on the hearing that the defendant have leave to so amend her pleadings as to raise this question. In considering the first reason advanced, we find that it depends entirely upon the fact that on the 15th day of December, 1903, more than four years after his marriage, the petitioner was suffering from a venereal disease, and that the disease was so obstinate it refused to yield to continuous medical treatment until the 1st of April following. The husband denies ever having had sexual intercourse with any other woman than his wife and charges that she communicated the disorder to him, and there is no proof of his being with other women, or of his showing any attention or devotion to them, nor of his frequenting disorderly houses. To arrive at the truth on this part of the case has imposed a most difficult duty and required a very careful examination of the testimony. It fully appears that the associations and temptations surrounding the wife were such as naturally would subject her to evil influences, likely to lead to the surrender of her virtue. No married woman of pure heart would act as she did. She visited, without her husband, a public dancing hall two or three times a week, danced and drank with young men, some of whom were strangers to her, and accepted their escort to her home at midnight (although professedly under the care and protection of Mrs. Sterratt, a married woman with whom she was boarding), leaning upon the arm of these voluntary guardians, notwithstanding the fact that the street cars were convenient and ran within a short distance of her home, affording a safe and convenient means of transport. Nor does a woman who has been faithful to her marriage vows make an appointment, as it appears this defendant did, with a total stranger, within at least two hours of their first introduction, to meet him on the following day, being Sunday,

for the purpose of going with him, at night, to a place of entertainment, in the city of New York. The acceptance of such a proposition by a married woman, under the condition proven, can have but one meaning; no virtuous woman would do it, and the fact that this defendant was so ready to compromise her virtue leads irresistibly to the conclusion that her marital duty to her husband had not been theretofore observed. The evidence shows that her morals were of a low grade. She conversed, apparently without a blush, with other men about her husband's loathsome disease, and her character, as disclosed by the evidence, satisfies me that she was unchaste. Nevertheless, I do not feel justified, giving all of this evidence the weight it is entitled to, in finding that she was afflicted with or communicated to her husband the disorder he admits he suffered from. In my judgment, the presence of this disease places upon the husband the duty of clearly satisfying the court that he contracted it from his wife, if he would avoid the proper inference to be drawn from his condition. The evidence is devoid of the slightest proof that the wife ever showed any evidences of such a disease. If her condition had been such as to communicate to her husband a malady so violent in its nature as to baffle the efforts of his physician to restore him to health for more than three months, it is difficult to believe that, without the slightest evidence of medical treatment, she could, within six days after the condition of her husband was discovered, be so far restored to health as not to disclose, under medical examination, the slightest evidence of the disorder she is charged by her husband to have communicated to him. The physician, whose respectability and competency were not questioned, shows that on the 20th day of December, 1904, he made an examination of the defendant for the express purpose of ascertaining whether any such disease was present, and reported to the defendant, and testified on the hearing, that he could discover no evidence of any such complaint. I have not overlooked the fact that Thomas Wilson and Hayes Thornton, a brother of the petitioner, have testified to admissions made by the defendant tending to show that she was afflicted, but the appearance of Wilson, while a

witness, and the character of his testimony, satisfies me that no reliance is to be placed upon his evidence. As to the statements of Hayes Thornton, the brother, they are too indefinite and uncertain on the crucial point to justify me in relying upon them; he does not pretend to state the words used by the defendant, his expression being "she finally admitted that she had it." This is 'his conclusion, but if he had given us the exact words, the admission might have been susceptible of a different interpretation. Wilson, who was in the employ of the petitioner, and Hayes Thornton, the brother of the petitioner, both manifested, during the course of their testimony, a prejudice and bias in favor of the petitioner such as to lead me to give little credit to their statements. In addition to all this, the petitioner himself stated to the witness Smith that while he at first thought he got it from his wife, he said, "I am satisfied, now, that I did not." Certainly no one knew better than the petitioner the true situation, and it is not to be credited that if he believed his dreadful condition was due to his wife he could, on January 11th, 1904, have written her the letter offered in evidence, in which he addresses her as "Dear Delia" and signs it "lovingly Harley;" or, on the 24th of December, nine days after he had made this discovery, go with his wife to visit their friends in New York State, and after she had remained there about five weeks, receive her back at his home in Elizabeth and treat her in a manner entirely at variance with the idea that she had not only been unfaithful, but had done him a most grievous wrong. I am satisfied that the petitioner has not maintained by a preponderance of evidence the charge he makes against his wife, and that the only logical conclusion to be drawn from the testimony is that his condition furnishes evidence of his adultery.

The second point raised by the defence I have resolved against the petitioner. The burden of showing connivance is, of course, on the party setting it up, and the evidence to sustain it should be substantially conclusive and practically admit of no dispute. Yet the court ought not to require such an absolute demonstration as the admission or confession of the conniver would afford. Conclusiveness should be interpreted to mean

that no other logical result could be reached by a fair mind, seeking for the truth, after careful consideration of every fact and circumstance bearing on the question, and if the facts, circumstantial or otherwise, in combination, show intentional connivance, the bar to the petitioner's relief becomes effective. It is clearly manifested by the evidence in this cause that the petitioner was aware of the wayward disposition of his wife, for he admits repeated remonstrances to her on the subject. Yet, with this knowledge, he permits his wife to leave the place at which they were boarding, on the 25th day of February, 1904, and to take rooms at the Sterratt house, a place he had previously left because, as he testified, it was not a fit house for a married man to live in. It is important, in this connection, to remember that at this time the husband had under his employ detectives who were watching the movements of his wife, and without the slightest attempt to guard or warn his wife, with his suspicions so strongly aroused, he consents to her leaving his home and making her abode, alone, in a house which had fallen under his condemnation. With affairs in this condition he takes the defendant, with the witness Wilson, on the night of March 11th, to a theatre in Newark, having previously arranged with the Gregory detective agency to have there present the two Gregorys (John and Francis) and a negro named Freeman, for the express purpose of seeing the defendant in order that there might be no mistake as to identification. This was the first step in the plan to procure the wife's adultery. On the following night the two Gregorys went to Elizabeth, were present at the dancing hall, and found there, not only the defendant and Mrs. Sterratt, as they had every reason to expect they would—the testimony showing that the defendant went to this dancing hall every Saturday night—but also the mysterious person known as Mr. Willis, who then first appears on the scene, who, having secured an introduction to the defendant, dances with her, walks home with her about midnight, and arranges to take her the next afternoon to the city of New York to attend the theatre. The defendant testifies that she made this arrangement subject to the approval of her husband, Willis having told her that he

was a friend of her husband; that according to the agreement she was to meet Willis at the depot of the Pennsylvania Railroad Company in Elizabeth, at four o'clock Sunday afternoon, if her husband consented to her going, otherwise she would not be there, and that she did obtain the consent. In support of her testimony on this point, we have the fact that she sent word to him to come down and see her right after dinner, at the Sterratt house, on Sunday, and that he came. What took place at the Sterratt house that afternoon is important. Mrs. Sterratt, Mr. Sterratt and the defendant, all testified that the petitioner said that he was going to Newark that evening and his wife asked him to take "them along;" that he declined to take them, and that thereupon the defendant said to him, "I have an invitation to go to the theatre in New York this afternoon with Mr. Willis, a friend of yours, if you have no objections;" and that the petitioner said, "All right, go ahead; Mr. Willis is all right." Mrs. Sterratt corroborates the defendant fully. Mr. Sterratt was not paying so much attention and does not claim to have heard all of the conversation, but he did hear the defendant tell her husband, after his refusal to take her to Newark, that she had an appointment with a gentleman to go to the theatre that night. The petitioner admits being there that Sunday afternoon, but denies being told anything about Willis. I think he is mistaken about this, because the only purpose for sending for him in a hurry, as far as it appears, was to obtain his consent to go to New York. Eliminate this from the case and there is nothing to show why his wife sent for him in such a hurry. Besides that, both Mrs. Sterratt and the defendant testify that the wife said to her husband, "Don't be in a hurry; I don't have to go until four o'clock; come upstairs with me while I comb my hair." The petitioner admits that he went upstairs with her and stayed up there while she combed her hair. It nowhere appears in this case that previous to this day the defendant went anywhere on Sunday, but by some remarkable coincidence one of the Gregorys, and the negro Freeman, who was subsequently to act as a porter, appeared in Elizabeth that Sunday afternoon, just about four o'clock, and saw Mr. Willis

on the street near the Pennsylvania railroad station waiting for the defendant, who shortly after that joined him, and after waiting nearly an hour for a train on the Pennsylvania road, although they could have gone earlier on the Central road, took the train to New York, followed by .Gregory and the negro. When Willis reached Jersey City, instead of crossing over the ferry and going to the theatre, he took the defendant, on the plea of getting something to eat, to a hotel in Jersey City, where he registered as "B. Willis and wife," after which they were assigned to a bedroom, referred to in the case as room number three. That the detective Gregory had some confidence that these parties would remain at the hotel for some considerable time, certainly longer than would be required to get a meal, is disclosed by the fact that he telephoned to Newark, to his father, to send over his brother as an additional witness. The telephoning was done before Gregory had ascertained that Willis and the defendant had been assigned to a bed chamber. On the arrival of the second Gregory from Newark, probably an hour after Willis had gone into the hotel, the negro assumed the part of a porter, knocked on the door of room number three, and on his statement that he was the porter, Willis, dressed only in his underwear, opened the door, and the defendant was seen by the three witnesses to be in bed, undressed. Having thus qualified themselves as witnesses to the infidelity of the defendant, they left the hotel and returned home. The subsequent conduct of Willis is explainable upon no other theory than, having compromised the defendant, his service was performed, for instead of attending the theatre, as he started out to do, and as the defendant requested he should do, he made the excuse that it was too late then, and took the defendant back to Elizabeth and left her at her home about nine o'clock. From that moment Willis vanished from sight; neither of the parties to the cause, nor any witness, had ever seen Willis before that Saturday night; nor was he ever seen after that Sunday night. The detectives do not appear to have taken the slightest steps to ascertain who he was, where he came from or what has become of him. He appeared Saturday, claiming to be a friend of the petitioner;

the petitioner is told Sunday afternoon the defendant was going to New York with Willis, a friend of his, and does not disclaim the friendship. It is hardly to be credited that these detectives should appear in Elizabeth that Sunday afternoon, at the precise time and particular spot where these parties had arranged to meet, unless they had had some information to that effect, and that information could only come from Willis. Why did Willis disappear? There was nothing said or done at the hotel at Jersey City which could give him the slightest cause for alarm, and no reason appears why he should secrete himself. I am forced to the conviction that this mythical person was employed, if not by the petitioner, by the detectives, as his agent, for the purpose of entrapping this woman. It is no excuse to say that her virtue was easily assailed; her very weakness required from her husband a watchful care over her, and a husband who consents to the adultery of his wife is not entitled to a divorce.

I cannot close my eyes to the fact that the circumstances proven in this cause lead to but one conclusion, and that is that Willis was an accomplice of the petitioner, and I am unwilling to confess to such a want of ordinary perception as to be unable to see through this flimsy scheme. I therefore find that both husband and wife have been guilty of offences which prevent either from justly demanding the recognition of this court, and I will advise a decree accordingly.